**CRUICKSHANK & CO., LIMITED and Pestonjee Bhicajee [Kutch], Plaintiffs-Appellees,**

v.

**Stavros K. SORROS, Defendant-Appellant,**

and

**Dutchess Shipping Co., Ltd. and International Ship Management, Inc., Defendants.**

No. 1097, Docket 84–9007.

United States Court of Appeals, Second Circuit.

Submitted April 15, 1985.

Decided June 17, 1985.

John C. Koster, Healy & Baillie, New York City, for plaintiffs-appellees.

Gregory J. Ligelis, Poles, Tublin, Patestides & Stratakis, New York City (Peter P. McNamara, New York City, of counsel), for defendant-appellant.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

OAKES, Circuit Judge.

This strange admiralty case, on submission to us, involves as real party plaintiff a proprietorship in Rajkat, India, conducting a ship's agency and stevedoring business in certain Indian ports, including the port of Vadinar. A vessel for which the plaintiff was acting as agent arrived at that port short of diesel bunker oil and hence unable to discharge its petroleum cargo; after four days of mooring with tug assistance, the vessel was towed out to an anchorage at sea by the port operator, an Indian governmental authority, which proceeded to assess the vessel, and when the vessel did not pay, to assess plaintiff $142,000 in "pullback charges." When plaintiff refused to pay the charges, the port authority suspended plaintiff's stevedoring license. Thereafter plaintiff and its principal brought suit for damages in the United States District Court for the Southern District of New York, naming as defendants two corporations—the Liberian owner of the vessel and its New York-based operations manager—and one individual, the operation manager's port captain, who had been ordered to India by the operations manager to try to straighten matters out. The corporate defendants defaulted, and judgment was entered against them in the district court, after a court trial before Mary Johnson Lowe, *Judge*, for damages, punitive damages, attorneys fees, and expenses, in an amount totaling $1,009,619.65. The district court then entered judgment in the same amount against the port captain on the theory that he is jointly and severally liable for the tort of conversion of the ship. Only he appeals. Since we are unable to fathom how there can be liability for conversion—a claim not pleaded in the amended complaint—where plaintiffs' possession or right to possession of the vessel is neither alleged nor proven, we reverse the judgment.

FACTS

The M/T IRINIO, a Panamanian flag vessel, was owned by codefendant Dutchess Shipping Co., Ltd. ("Dutchess"), a Liberian corporation. Codefendant International Ship Management, Inc. ("ISM"), a New York corporation, acted as operations manager of the IRINIO. Appellant and codefendant Stavros K. Sorros was employed by ISM as a port captain; his job was to troubleshoot around the world for ISM, routinely meeting and inspecting vessels upon their arrival at foreign ports.

In December 1981, ISM entered on behalf of Dutchess into a charter party for the IRINIO with the Indian Oil Company ("IOC"), an Indian governmental agency exercising exclusive control over the importation and distribution of all oil products in India. The charter party called for the IRINIO to carry a cargo of crude oil from Venezuela to one or two discharge ports on the west coast of India, one of which was the port of Vadinar. Vadinar has no berthing facilities but does have an off-shore single-buoy mooring facility, or SBM, which is operated by IOC and at which vessels anchor to discharge their oil cargo through a submerged pipeline. The port nearest to Vadinar is some sixty kilometers away.

On February 5, 1982, while the IRINIO was en route, ISM entered into a general agency agreement with Cruickshank &

Company, Limited ("Cruickshank"), a ship's agent operating in India. Because Cruickshank itself does not maintain an office near Vadinar, it appointed as sub-agent Pestonjee Bhicajee [Kutch] ("Kutch"), a sole proprietorship doing business as steamship agent, stevedore, clearing and forwarding agent, ship chandler, and container terminal operator. Although Kutch has an office at Jamnagar, the port sixty kilometers from Vadinar, communications with ISM were maintained through Cruickshank's office in Bombay.

On February 6, the Master of the IRINIO transmitted a radiogram to Cruickshank requesting that Cruickshank make arrangements for the vessel to bunker, *i.e.*, to fill up with diesel fuel oil for her engines, upon her arrival. Thereafter, the IRINIO apparently encountered engine trouble and remained idle for some three days while repairs were being performed, during which she consumed most of her little remaining fuel oil. On February 10, the Master again transmitted a request to Cruickshank for delivery of seventy long tons of diesel oil upon the vessel's anticipated arrival the following day, similar requests for fuel having been sent by telex from ISM to Cruickshank that same day and on the two previous days. Kutch, however, directed Cruickshank to inform ISM that IOC would not release any fuel unless payment was received in advance, despite the fact that IOC owed Dutchess a considerable amount of money in charter hire earned on the voyage.

Apparently Cruickshank used the wrong telex number in attempting to communicate this demand to ISM, which remained unaware that IOC would not bunker the vessel until funds were remitted in advance. The following day, February 11, the Master requested "urgent urgent" that Cruickshank obtain the seventy long tons of diesel oil, and ISM continued to instruct Cruickshank by telex to provide the vessel with the required fuel. On arriving at the SBM off Vadinar on February 12, the IRINIO apparently had only 1.2 tons of diesel oil left on board, an amount insufficient to enable her to discharge. She therefore remained at the SBM awaiting a fuel delivery, meanwhile needing tug assistance from the port authority to remain at the mooring. By Friday, February 12, Cruickshank and ISM were finally in mutual contact, but funds were not remitted to IOC until the following Monday, when $37,500 was sent to Cruickshank.[1]

Meanwhile, the Kandla Port Trust ("KPT"), the Indian governmental port authority that was supplying tug boats to keep the IRINIO properly moored at the SBM, levied a fee known as "pull-back charges" against the vessel for the services provided by its tug boats. Although the original terms of the charter party obligated IOC to pay the pull-back charges assessed by KPT, IOC apparently refused to allow the vessel to discharge, even after the IRINIO had received three tons of fuel obtained by Kutch through local sources, until the Master signed a letter purporting to shift the obligation to pay the pull-back charges from IOC to Dutchess. On February 16, 1982, after finally discharging her oil cargo, the IRINIO went to an outer anchorage some five to seven miles at sea to await delivery of additional bunker fuel; at this point, the Master also sent Kutch a letter of protest citing Kutch's failure to provide the diesel oil when requested. On the same day, KPT advised Kutch that Kutch was being held responsible for seeing to it that the pull-back charges were paid and that Kutch should therefore take steps to ensure that the IRINIO did not depart until the charges were satisfied.

While the parties remained at odds over who was responsible for paying the pull-back charges, ISM sent Sorros from New York to India to discuss the situation with Cruickshank, Kutch, and a Bombay attorney who represented the vessel's protection

---

1. The three-day delay before IOC received bunker fuel funds was not necessarily attributable to ISM. On February 13, a Cruickshank affiliate delivered a bank draft to IOC for approximately $17,400 with an urgent request that IOC provide fuel for the vessel, but IOC refused to accept the funds because, Sorros claims, delivery was attempted on a weekend.

and indemnity underwriters ("P & I Club"). On March 12, Sorros met in Bombay with the attorney, who agreed to seek a bond from the P & I Club in London that would secure the pull-back charges claim. On March 15, Sorros proceeded to Vadinar to inquire about the situation and to obtain Kutch's assistance in boarding the vessel. The next day, when Sorros boarded the IRINIO in the company of a Kutch employee, the ship's Master evidently expressed anger at Kutch for its failure to respond promptly to his repeated requests for diesel oil; the Kutch representative, however, attributed the delay to Cruickshank's failure to issue the necessary instructions. Sorros spoke with the Master, discussing the condition of the vessel and its fitness to sail, and upon leaving observed a barge delivering fuel that had been procured for the vessel by Kutch.

Sorros then returned to Bombay, where he met with a Cruickshank representative and the P & I Club attorney. The Cruickshank representative blamed Kutch for the problems at Vadinar, but warned Sorros that the IRINIO would not be permitted to leave port unless the pull-back charges were paid and that Cruickshank and Kutch were preparing to seek a judicial order of arrest for the vessel. The attorney told Sorros that he had been unable to obtain a bond from the P & I Club because liability for pull-back charges was not within the P & I insurance coverage. Sorros testified that he then reported the status of the situation to ISM, which indicated that it would itself arrange for a bond. Sorros then left India to visit Greece.

Meanwhile, the IRINIO had departed from Vadinar before any order for its arrest had issued, proceeding to Singapore and then to Taiwan, where it was scrapped, the victim of a declining oil market. In June 1982, after a meeting in New York between ISM and Cruickshank at which ISM declined to pay Cruickshank and Kutch for the pull-back charges, Kutch and Cruickshank filed suit in the district court against Dutchess, ISM, and Sorros.[2]

The amended complaint stated three causes of action, the second and third advanced in the alternative. The first count alleged that, after the IRINIO had left Vadinar in breach of the corporate defendants' contractual obligation to pay the pull-back charges, KPT not only assessed the charges against Kutch but threatened not to renew Kutch's stevedoring license, which was to expire on March 31, 1982, and to withhold various other of KPT's exclusive port services and facilities, unless Kutch paid the charges by March 31, 1982. The complaint further alleged that Kutch challenged KPT's proposed action in an Indian court and that on May 5, 1982, the Indian court issued an order renewing Kutch's stevedoring license for two years and prohibiting KPT from discriminating against Kutch in providing port services pending the outcome of court proceedings to determine Kutch's liability for the pull-back charges—with Kutch to post bond to secure those charges, a bond ultimately posted by Cruickshank on Kutch's guarantee of reimbursement. As a result of Cruickshank's having posted bond and against the possibility that the Indian court will at some point draw against it, plaintiffs requested that damages be assessed against the corporate defendants for $142,000, the amount of the bond posted to secure KPT's claim against Kutch.

The second count alleged that, as a result of the corporate defendants' breach of their contractual obligation to pay the pull-back charges, KPT refused to renew Kutch's stevedoring license,[3] thus rendering the license "imperiled" and Kutch's business at

---

**2.** The district court is not the only trial court to address issues in this case; according to the deposition testimony of Kutch's proprietor, there are two lawsuits pending in Indian courts—in one, Kutch and Cruickshank are plaintiffs challenging KPT's suspension of Kutch's license, while in the other, KPT is plaintiff in an action against Kutch and Cruickshank for nonpayment of the pull-back charges.

**3.** The Kutch proprietor testified that, in apparent defiance of the Indian court's order, Kutch's stevedoring license was suspended in April 1982, and apparently continues to be suspended.

the ports of Vadinar and Kandla damaged, as were its good will and reputation, in an amount totaling $1 million. The second count was advanced in the alternative with the third and last cause of action, which alleged a conspiracy among Dutchess, ISM and Sorros to cause Kutch damage by causing KPT to refuse to renew Kutch's stevedoring license, with a resulting loss of good will, reputation, business, etc., also in the amount of $1 million.

No doubt to Sorro's chagrin, the corporate defendants defaulted, and judgment was entered against them on the first and third causes of action after a two-day bench trial in which the only witnesses were Kutch's sole proprietor and Sorros, though the testimony of ISM's president and sole shareholder had been taken by deposition. The district court awarded plaintiffs $142,000 plus interest, presumably on the first count. In addition, the court rendered judgment against the defaulting corporate defendants on the third count for $336,000, which is the sum of awards of (A) $84,000 for interest at 15% on each of the guarantees that Kutch and Cruickshank had been required to post in India, (B) $200,000 for lost earnings, (C) $39,000 in expenses for six round trips from India, (D) $8,000 for attorneys' fees incurred in India, and (E) $5,000 for salary and staff expenses to prepare for the litigation. In addition, the court awarded the plaintiffs reasonable attorneys' fees and costs, and $500,000 for loss of business and injury to reputation stemming from the suspension of Kutch's license as a result of defendants' "causing the vessel, the IRINIO, to leave Vadinar port without paying properly assessed charges, together with interest from the date of this order." [4] The district court described the award of $500,000 as

punitive damages, based upon the fact that, one, this Court finds that the evidence over and above the default is undisputed that the corporate defendants knew that the sum of money was due and owing; two, that they knew or had reason to know that it was an illegal act to leave port without proper authorization and without paying all sums due; three, that the act of taking the ship or causing the ship to leave the port without paying the sums due was not only an intentional tort but may have been and most possibly was a criminal act.

Sorros, an individual defendant below and now the sole appellant, was to fare identically. After requesting post-trial briefs addressing the extent of Sorros's liability for plaintiffs' damages, the district court found that Sorros had "participated in a significant way in facilitating the departure of the M.V. IRINIO from her offshore anchorage without payment of port charges" and that "Sorros did not act in good faith since he knew the port charges had been unpaid." Relying upon *Restatement (Second) of Torts* § 233 (1965)[5] and *Restatement (Second) of Agency* § 343 (1958),[6] the court held that Sorros was

---

4. Presumably these damage awards are based on a finding that the charges were properly assessed, although the basis for such a finding is unclear since there was no proffer of Indian law by either party.

5. The district court quoted a subsection and comment to § 233 as follows:

§ 233. *Conversion by Disposition by Agent as Against One Other Than Principal.*
(1) Except as stated in Subsection (4) [footnote omitted], one who as agent or servant of a third person disposes of a chattel to one not entitled to its immediate possession in consummation of a transaction negotiated by the agent or servant is subject to liability for a conversion to another who, as against his principal or master, is entitled to the immediate possession of the chattel.
Comment (a) subsection (1) reads in part: Likewise an agent who delivers a chattel to his principal in consummation of a sale or other transaction which he has himself negotiated is within the rule stated in this Section, if the transaction purports to transfer a proprietary interest to the principal.

6. Section 343, quoted in full by the court, reads:
§ 343. *General Rule*
An agent who does not act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the

jointly and severally liable with the defaulting corporate defendants "for the intentional tort of conversion" and as such "jointly and severally liable for all of the damages awarded [appellees] under the Third Cause of Action pleaded against defendants Dutchess Shipping Company, Ltd., and International Ship Management, Inc., and the First Cause of Action pleaded against defendant Sorros." [7]

## DISCUSSION

■ It is, of course, basic to the law of conversion that liability runs only to a possessor of a chattel or one who was entitled to immediate possession of the chattel. *See Restatement (Second) of Torts* §§ 224A, 225 (1965); W. Prosser, *Handbook of the Law of Torts* § 15, at 93–97 (4th ed. 1971). As the New York courts have put it, "[t]o establish conversion the plaintiff 'must demonstrate legal ownership or an immediate superior right of possession to a specific identifiable thing' [citing case] and that the defendant exercised an unauthorized dominion over that property, which can be specific money, to the exclusion of the plaintiff's rights." *Meese v. Miller*, 79 A.D.2d 237, 242–43, 436 N.Y. S.2d 496, 500 (1981); *accord General Electric Co. v. American Export Isbrandtsen Lines, Inc.*, 37 A.D.2d 959, 327 N.Y.S.2d 93, 95 (1971). Plaintiffs argue that "[i]nchoate rights are sufficient" to support an action for conversion, and that they "were deprived by Sorros's wrong of a right to perfect (by arrest) a 'personal' dominion over the IRINIO." But they concede that until the vessel had been formally arrested, no personal right of possession reposed in them, and this is fatal to a claim for conversion.[8] Nor do the admiralty decisions in *Sidney Blumenthal & Co. v. United States*, 30 F.2d 247 (2d Cir.), *cert. denied*, 279 U.S. 847, 49 S.Ct. 345, 73 L.Ed. 991 (1929), or *The Poznan*, 276 F. 418 (S.D.N.Y.1921), assist them. *The Poznan*, 276 F. at 433, was simply a case in the classic mold involving inducement of breach of contract. It has nothing to do with conversion. *Sidney Blumenthal* does at least consider conversion, but only in language that is fully consistent with traditional tort law: the buyer of goods being shipped can make out a claim for conversion against the shipper that is analogous to a claim against a bailee who has possession for a limited purpose and "uses the property beyond the terms of the contract." *Sidney Blumenthal & Co.*, 30 F.2d at 248. The buyer in that case, as the owner of the goods, had a right to possession. But here neither Kutch nor Cruickshank had any interest in the IRINIO.

■ Perhaps the foregoing only serves to underscore the obvious: the district court mistook a case in contract for one in tort. Plaintiff's multiple claims for damages are based upon injury flowing from a single allegation of breach of obligation— the corporate defendants' refusal to pay the pull-back charges assessed by KPT

---

principal's interests, or where the principal owes no duty or less than the normal duty of care to the person harmed.
The court also quoted the following part of the comment to § 343:
d. An agent who assists another agent or the principal to commit a tort is normally himself liable as a joint tort feasor for the entire damage. Thus, those who assist in the wrongful removal of chattels, are subject to liability together with those for whom they act, except where their good faith creates a privilege in them to act. See the Restatement of Torts, §§ 875–877. The act of the agent may play too small a part to render him legally responsible for the result, or the agent's innocence and purpose may create a privilege for him to act. In neither case, however, is he excused because he acts at the command of the principal.

7. The district court inadvertently stated that the first cause of action was pleaded against Sorros; it was not.

8. Even assuming an order for the IRINIO's arrest had issued before its departure, we are not informed that a possessory interest in the IRINIO would have risen in plaintiffs, let alone one sufficient to sustain a cause of action for conversion. Since execution on a maritime lien following arrest is made only by an admiralty court proceeding in rem, any possessory interest created by the arrest would seem to reside in the Indian court issuing the arrest, not in plaintiffs. *See* G. Gilmore & C. Black, *The Law of Admiralty* 587–90 (2d ed. 1975).

against Kutch.[9] But the refusal to pay the pull-back charges, if wrongful, constitutes breach of an obligation of contract, not one of duty in tort, since the obligation arose only because of the corporate defendants' alleged agreement to pay the charges in modification of the arrangement determined by the charter party as originally drafted. Accordingly, it is not tort but contract law that determines the validity of the claim for damages.

Given this view of the case, it is easy to see where the district court went wrong in finding Sorros jointly liable for the damages awarded against the defaulting corporate defendants, for the district court justified Sorros's individual liability to plaintiffs by reference to common law principles of agency applicable to tortfeasors, not to parties implicated in a contract. Sorros, not a party to the contract at issue, cannot be found liable for damages resulting from its breach, notwithstanding his status as an agent of one of the parties in breach. *See, e.g.,* W. Prosser, *supra,* § 92, at 613 (comparing obligations of contract with those in tort); *cf. Restatement (Second) of Agency* § 328 (agent authorized to bind principal in contract not liable for principal's breach). There is simply no basis for holding Sorros liable for the damages claimed.

This case is all the more puzzling for the fact that, even if the law were such that a claim in tort could be made out against Sorros and the defaulting defendants, the district court seems inexplicably not to have considered staying proceedings pending disposition of the two Indian lawsuits, *supra* note 2, which address two issues crucial to plaintiffs' claims—KPT's justification for imposing the pull-back charges upon Kutch, and KPT's justification for suspending Kutch's stevedoring license. Surely the Indian courts are far better positioned than we to resolve the issues of fact and law that even a cursory review of this case strongly suggests are material

but inaccessible to us. It should not go without saying, for example, that Kutch's sole proprietor was considerably less than enthusiastic in his description of the conduct of the IOC and KPT, as well as the customs authorities, stating in his deposition testimony that "whenever they get an opportunity to get something out of you, they will try to make your life miserable." In other words, the courts in India may conclude that Kutch cannot be held responsible for the port charges and that KPT's action with respect to Kutch's license was pretextual. At this point, we have no idea whether under Indian law Kutch can or will be held responsible for these charges; we have only the factual situation that, in the midst of a dispute over responsibility for payment of the pull-back charges and immediately following Sorros's visit to the vessel—possibly as a result of directions given by Sorros on that visit as the district court doubtless viewed the case—the Master sailed out of Indian waters and away from the possible arrest of the vessel, leaving Kutch holding the bag, so to speak.

We conclude that the judgment against Sorros must be reversed. We need not, therefore, address the propriety of the award of attorney's fees and punitive damages against him. The corporate defendants defaulted in the district court and do not now appeal; we therefore do not address the propriety of the judgment entered against them.

Judgment reversed.

---

**9.** The refusal to pay the pull-back charges is the direct cause of the alleged injury—the assessment of those charges against Kutch—grounding plaintiffs' claim for damages in the first cause of action; it is also the act that allegedly triggered KPT's suspension of Kutch's stevedoring license, which is the third-party act grounding the claim for consequential damages in the second and third causes of action.